UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |
|---|---|
| IN RE ASHLEY MADISON CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates to:<br><br>ALL CASES | )<br>)<br>)<br>)   MDL No. 2669<br>)<br>)<br>)   Case No. 4:15MD2669 JAR<br>)<br>) |

**PLAINTIFF CHRISTOPHER RUSSELL'S MEMORANDUM IN SUPPORT OF MOTION FOR APPOINTMENT OF MICHAEL J. FLANNERY AS LIAISON COUNSEL FOR THE FRAUD GROUP**

**I.    Introduction**

The consolidated actions in this MDL proceeding involve two substantively distinct groups – one group of consumers seeking redress for Defendants' disclosure of consumers' personal information (the "Data Breach Group") and one group seeking recovery for Defendants' deceptive use of "fembots" to lure paying consumers (the "Fraud Group").  Plaintiff Christopher Russell moves this Court pursuant to Rule 23(g) and the Court's Practice and Procedure Order Upon Transfer [Dkt. No. 5] for the appointment of Michael J. Flannery of Cuneo Gilbert & LaDuca, LLP ("CGL") as Liaison Counsel for the Fraud Group.[1]

---

[1] The undersigned counsel intend to file an application for appointment of Gary E. Mason of Whitfield Bryson & Mason LLP as Interim Lead Counsel for the Fraud Group.  Mr. Mason has devoted his practice to plaintiffs' class actions for over 25 years and has substantial experience litigating privacy and data breach cases.  He is currently serving as interim Liaison Counsel in *In re: U.S. Office of Personnel Management Data Security Breach Litigation*.  *See* firm resume of Whitfield Bryson & Mason LLP, attached hereto as Exhibit A.  In addition, the undersigned

The Judicial Panel on Multidistrict Litigation ("JPML") in its Transfer Order recognized that the *Russell* action, and by extension the other "fembot" related consumer fraud claims, involve unique issues[2] and the Court's Practice and Procedure Order Upon Transfer [Dkt. No. 5] provides for "the position of liaison counsel **for each group** who will serve as the primary contact person for the Court regarding administrative matters." (Dkt. 5 at ¶ 8) (emphasis added).

With the support of the undersigned counsel, Mr. Flannery seeks appointment as Liaison Counsel for the Fraud Group.  As discussed more fully below, the persons affected by the Ashley Madison data beach fall into two overlapping groups:  all persons whose data was disclosed by the data breach and persons who were fraudulently induced into subscribing to the site and paying for services.

These are distinct groups with diverse interests and potential conflicts.  Discovery for the Data Breach and Fraud Groups will be different:  with assistance from its technology experts, moving counsel has downloaded and reviewed over 200,000 emails and reviewed downloaded "fembot" coding relating solely to the Fraud Class.  This discovery is unrelated to Defendants' data security representations, data security or the data breach, just as data/security discovery is irrelevant to claims consumers were damaged by Defendants' deceptive use of "fembots."  Each group will necessarily rely on different experts; for example, the Data Breach Group will need computer security experts and the Fraud Group will use marketing experts, and each group has different damage experts who will necessarily develop different and potentially conflicting

---

counsel intend to seek the following appointments to the Steering Committee for the Fraud Group:  Charles J. LaDuca of Cuneo Gilbert & LeDuca, LLP,  Michael L. Braunstein of The Braunstein Law Firm, PLLC, and Robert K. Shelquist of Lockridge Grindal Nauen P.L.L.P.  Copies of the firm resumes for these firms are attached to this motion as Exhibits B, C and D.  The undersigned counsel have proposed a schedule for the filing of leadership applications.  *See* Plaintiff Christopher Russell's Memorandum Regarding Proposed Initial Status Conference Agenda Items, filed herewith.

[2] "To the extent that *Russell* involves unique issues, the transferee judge has the discretion to handle those issues through the use of appropriate pretrial devices . . ." (JPML Transfer Order [Dkt. No. 1] at 2).

damage models.  Last, and perhaps most importantly, each group will pursue legal theories that are likely to directly conflict with each other, in particular with respect to the Term of Service and its included Arbitration Provision.

Not only will each group have different damage experts and measure of damages, but the ability to collect a damage award presents additional conflicts because Defendants are private Canadian corporations/individuals with limited collectible assets.  Other potential conflicts exist.  The Fraud Group alleges that there is no contract because Defendants' fraudulent and deceitful acts knowingly mislead them into agreeing with Ashley Madison's Terms of Service, joining the website and spending money -- potentially conflicting with the Data Breach Group's breach of contract and breach of implied contract claims.  That the groups differ on whether there is a contract is potentially significant because Defendants contend that consumers' contractual obligations include an arbitration provision with a class action waiver.

These potential conflicts could impact the adequacy of class representatives or counsel seeking to represent both groups or present questions regarding impermissible claim-splitting where arguments could be made that class certification or settlement approval should be denied because the class representatives chose to pursue certain class claims while jeopardizing others.

Movant will be seeking the appointment of Gary E. Mason of Whitfield Bryson & Mason LLP as Co-Interim Class Counsel for the Fraud Group (as well as a Steering Committee for the Fraud Group), understands other counsel may also file, and suggests a uniform briefing schedule to efficiently resolve motions regarding leadership issues and ensure a coordinated structure that protects the diverse interests and potential conflicts between the groups.  *See* Plaintiff Christopher Russell's Memorandum Regarding Proposed Initial Status Conference Agenda Items, filed herewith.

The Fraud and Data Breach Groups warrant separate liaison counsel and Michael J. Flannery of Cuneo Gilbert & LaDuca, LLP is well-qualified to serve in this position.

## II.     Factual Background

### A.     Ashley Madison

AshleyMadison.com is owned by Avid Life Media, a privately-held Canadian corporation founded by its CEO Noel Biderman.  Defendants operate AshleyMadison.com to facilitate sexual encounters for people who are married or are in committed relationships. Defendants market AshleyMadison.com with the slogan, "Life is short. Have an Affair" and target married or otherwise involved people for their matchmaking services.  Defendants represent that "[t]housands of cheating wives and cheating husbands sign up everyday looking for an affair."

Ashley Madison's revenue model relies upon users purchasing "credits" to interact with one another, as opposed to a subscription-based model.  To initiate a conversation with another user, one must "pay" five credits.  Users buy credits from the website and enter their credit or debit card information to buy credits.  Various means of interacting with other users, such as having instant messaging, online chats, or sending messages to prospective matches, cost different amounts of credits.  Ashley Madison substantially contributed to the $115 million in gross revenue for Defendant Avid Life Media in 2014, resulting in pretax profits of $55 million.

### B.     The Data Breach

On July 12, 2015, Defendants learned that their computer systems had been hacked by notification on each of their employees' internal computers greeting screen.  The statement provided that "[w]e have taken over all systems in your entire office and production domains, all customer information databases, source code repositories, financial records, emails."

On or about July 19, 2015, a third party calling themselves the "Impact Team" announced that it had hacked Ashley Madison, downloaded Ashley Madison users personal information, along with large amounts of Defendants' internal documents and employee emails. The "Impact Team" threatened to release the personal information, other internal documents and communications if the website was not shut down. Defendants did not shut down the site and the hackers released the customers' personal information and Defendants' internal documents and communications.

  **C.** **The Data Breach Lawsuits**

On July 22, 2015, three days after the release of customers' personal information, the first data breach action was filed by the The Driscoll Firm, P.C. and Dowd and Dowd, P.C. This lawsuit was followed by the filing of multiple data breach actions in varying Districts throughout the country. While several of these actions made consumer fraud claims relating to Defendants' data protection representations, none made consumer fraud claims relating to Defendants creating false female profiles and "fembots" to lure in and profit from consumers.

  **D.** **The Released Information Reveals Defendants' Fraud**

The released information revealed that a significant percentage of female profiles on the site are fake. Included in the released information was Defendants' computer code, including code from fake female robot profiles intended to interact with male customers. The site's source code reveals that it was designed to create the illusion that there were women on the site eager to start a conversation and interact with male visitors to the site. Comments in the code contain "a set of descriptions for how the engager bots should act" providing:

> host bot mother creates engagers
>
> birth has been given! let the engager find itself a man!

5

>randomizing start time so engagers don't all pop up at the same time
>
>for every single state that has guest males, we want to have a chat engager

The code includes messages to be sent automatically from the the bot to the guest member.  These messages, of which there are many, were intended to deceive guest members that the messages were from real women.  Examples of these messages include:

>I\'m a new member just saying hello.  I think I\'m alot of fun. I like to try new things and I\'m really up for anything you can think of. You can send me a message but I prefer to chat if you are ok with that.
>
>I don\'t want to send any opening lines because I am not that generic but I would definitely like to chat sometime.
>
>Hello Hello\' After years of :( I\'ve decided to take :) into my own hands and try something completely different.  I\'ve never done anything like this before. Have you? Are you a romantic? Have a good sense of humor? A great imagination? Can you make me smile?
>
>My profile may not reveal that much about me but that\'s because I\'m saving the best stuff for when we chat. Do you ever chat online?
>
>I recently joined to see if I could find someone who may be in a similar situation as me.  Not completely fulfilled and looking for some good, clean fun. Tell me a little bit more about yourself and if I think we\'re compatible I\'ll write you back.
>
>I\'m dropping by to say hello. I\'m fairly new to an online experience but at this point in my life I\'m willing to try something new and different to see if someone can spark my interest.  If you\'d like to chat please either send me a message or if you see me online then let\'s chat.

Emails in CEO Noel Biderman's inbox contain evidence that the company knew  that most of their money came from bots flirting with men. *See, e.g.,* Powerpoint, "Engagers vs

Females," attachment to Email from Rizwas Jiwan to Noel Biderman, dated Nov. 30, 2012 (showing that 24 hours before purchase, 81% of messages were sent by "hosts").

Avid Life Media executive Keith Lalonde, who spearheaded international efforts for the company, sent a long email to Biderman and other senior management on June 27, 2013, with the subject line 'how angels are made.' In it, he details how workers use something called the "**fraud-to-engager tool**" to build profiles. ('**Should tweak it and rename it**,' Lalonde noted. "Um, yeah.") (Email from Keith Lalonde to Noel Biderman Thursday, June 27, 2013, Re: How Angels Are Made (emphasis added)).

The fraud was successful. The disclosed documents reveal that 80% of the men who 'convert,' or make a purchase on Ashley Madison, do so as a result of engagers.

> E.   **Mr. Russell Brings the First Consumer Fraud Action Relating to Defendants "Fembot" Conduct**

On September 11, 2015, Mr. Russell filed his consumer fraud case based on Ashley Madison's practice of creating false female profiles and "fembots" to lure in and profit from consumers. When *Russell* was filed, none of the data breach cases contained any claims regarding Defendants creating false profiles and "fembots" to profit from consumers.

Because of the diverse interests and potential conflicts between the fraud and data breach classes, the *Russell* action does not make any data breach claims.

**III.   The Diverse Interests And Potential Conflicts Between The Fraud And Data Breach Groups Warrant Separate Liaison Counsel And Michael J. Flannery of Cuneo Gilbert & LaDuca, LLP Is Well Qualified To Serve In That Capacity**

The diverse interests and potential conflicts between the Data Breach and Fraud Groups warrant separate liaison counsel and Michael J. Flannery of Cuneo Gilbert & LaDuca, LLP is well qualified to serve as Liaison Counsel for the Fraud Group.

7

### A.   The Diverse Interests And Potential Conflicts Between The Fraud And Data Breach Groups Warrant Separate and Unconflicted Liaison Counsel

The diverse interest and potential conflicts between the Data Breach Group and Fraud Group warrant separate representation and liaison counsel.  In addition to having divergent interests in discovery and experts (and the related costs), potential conflicts exist regarding both the ability to collect a money judgment and asserted claims.  For example, the Fraud Group's claims that there is no contract conflicts with the Data Breach Group's breach of contract and breach of implied contract claims – potentially significant given Defendants' averment that the parties' contract contains an arbitration provision with a class action waiver that Defendants will attempt to enforce.  These diverse interests and potential conflicts could also impact the adequacy of class representatives or counsel seeking to represent both groups.  Further, it may raise future questions regarding impermissible claim-splitting where it could be argued that class certification or settlement approval should be denied because the class representatives chose to pursue certain claims while jeopardizing others.

A class action may only be maintained if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  A "critical purpose of the adequacy inquiry" under this rule is "uncovering conflicts of interest between the named parties and the class they seek to represent." *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009).  To demonstrate adequacy of representation, there must be "an absence of antagonism between the representatives and absentees," *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011), and a class representative must "possess the same interest" as the class members she seeks to represent.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (internal quotations omitted).  Where such conflict or antagonism exists, striking the class allegations is appropriate.  *See, e.g., Dodd-Owens v. Kyphon, Inc.*, No. C06-3988 JF

8

(HRL), 2007 WL 3010560, at *3-4 (N.D. Cal. Oct. 12, 2007); *Lee v. Children's Place Retail Stores, Inc.*, No. 14C3258, 2014 WL 5100608, at *3 (N.D. Ill. Oct. 8, 2014).

Rule 23's adequacy requirement applies to *both* the class representatives, *and* their counsel. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (adequacy depends in part on whether "the named plaintiffs *and their counsel* have any conflicts of interest with other class members") (emphasis added); William B. Rubenstein, *Newberg on Class Actions* § 3:54 (5th ed.). Class counsel has a fiduciary duty to all class members, which "does not permit even the appearance of divided loyalties." *See Rodriguez*, 563 F.3d at 968 (internal quotations omitted).

Where there is a potential conflict among class members with competing interests, Rule 23 requires "structural assurance[s] of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627. Such assurances may include "division into homogeneous subclasses" coupled with "*separate representation to eliminate conflicting interests of counsel.*" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (emphasis added); *Id.* at 831-32 (finding that district court should have ensured that the "potentially conflicting interests of easily identifiable categories of claimants be protected by provisional certification of subclasses under Rule 23(c)(4)").

A similar conflict precluded a finding of adequacy in *In re Microsoft Corp. Antitrust Litigation*, 218 F.R.D. 449, 452 (D. Md. 2003), where the court considered whether plaintiffs' counsel could adequately protect the interests of both an end-user class and a class of original equipment manufacturers ("OEMs") that sold to those end users. Given that there could only be a single recovery between the two classes, the court held that "[t]his dual scenario places plaintiff's counsel in a position of irreconcilable conflict because they seek to represent . . . an

9

end-user class and they seek to represent here a class of OEMs and other persons who sold to the endusers." *Id.* "In light of this conflict, the 'adequacy' prong of the Rule 23 test clearly cannot be met." *Id.*

The same concerns exist here. The Data Breach Group is trying to prove Defendants' breach of a contract and implied contract, while the Fraud Group seeks to show that no contract exists. Class counsel has a fiduciary duty to all class members, so the mere "appearance of divided loyalties" is not permitted. *See Rodriguez*, 563 F.3d at 968 (internal quotations omitted). Here, there is more than the appearance of divided loyalties – the two groups are trying to prove opposite claims regarding the contractual agreement.

Further, jointly representing these divergent interests presents future questions regarding impermissible claim-splitting, raising questions regarding whether class certification or settlement approval could be denied, because the class representatives chose to pursue certain class claims while jeopardizing others. Case law exists supporting the proposition that class certification should be denied because the class representatives are inadequate when they opt to pursue certain claims on a class-wide basis while jeopardizing the class members' ability to subsequently pursue other claims. *Clark v. Experian Information Solutions, Inc.*, 2001 U.S. Dist. LEXIS 20024, Nos. 00-1217-24, 00-1218-24 & 00-1219-24, 2001 WL 1946329, at *1-*6 (D.S.C. Mar. 19, 2001). In these instances, courts have reasoned that "the possible prejudice to class members is simply too great for the Court to conclude that the named Plaintiffs' interests are aligned with those of the class." *Id.* at *4. Cf. *See Amchem*, 521 U.S. at 626-627 (finding inadequate representation where settling parties achieved a global compromise with no structural assurances of fair and adequate representation for diverse groups).

The best way to avoid these questions in the future is to put structural protections in place now.  Because of the diverse interests and potential conflicts between the Fraud and Data Breach Groups,  Lead Counsel, Liaison Counsel and a Steering Committee should be appointed for each group.

> **B.    Michael J. Flannery Is Well Qualified To Be Liaison Counsel For the Fraud Group**

Mr. Flannery has been in practice for over 25 years, and has practiced for the last 15 years in St. Louis.  His practice, although nationwide in scope, has included numerous complex class action matters at both the state and federal court level in Missouri, including numerous cases litigated in this District.  As such, he is fully conversant with this Court's local rules and procedures.

Mr. Flannery has significant complex class action experience, including several matters litigated in this District.  During his career, he has worked on numerous high profile cases, including: *In re Charter Communications, Inc. Securities Litigation*, E.D. Missouri, MDL No. 1506, Case No. 02-CV-1186 CAS (securities fraud class action settled for $144 million on behalf of investors); *In re NASDAQ Market-Makers Antitrust Litigation*, S.D.N.Y. MDL No. 1023 (investors alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy; case was settled for a total of $1.027 billion dollars, at the time the largest antitrust settlement ever); and *Law, et al. v. National Collegiate Athletic Association*, D. Kan., 2:94-cv-2053-KHV (in the Restricted Earnings Coach Antitrust litigation, hundreds of college coaches alleged wrongful denial of fair pay by their schools as part of a misguided NCAA effort to cut costs; at trial, a federal court jury in Kansas City, Kansas awarded the coaches over $70 million in damages).

11

CGL provides a wealth of litigation, leadership, claims resolution, and strategy experience. CGL has successfully lead large, multidistrict litigation and has a demonstrated ability to organize, manage and work cooperatively with counsel for all of the involved parties. Other federal courts have recognized as much by appointing CGL to leadership positions in other MDLs and class actions.

CGL devotes the majority of its practice to the representation of clients involved in antitrust, securities, corporate governance, consumer protection, and products liability complex and class action litigation. The firm has achieved success for a range of clients by: helping to recover billions of dollars in shareholder litigation, obtaining compensation for Holocaust survivors, working to recover hundreds of millions of dollars for homeowners with defective construction materials, and, in several jurisdictions, ending the practice of jails subjecting minor law violators to unnecessary strip searches. The firm has years of experience litigating and prosecuting complex class action such as this case, including such cases as the *Enron Securities Litigation* where more than $7 billion was recovered for defrauded investors and CertainTeed's defective organic shingles litigation where the firm served as co-lead counsel in an MDL that secured a settlement valued at more than $700 million.

CGL has also been involved in a host of cases involving product defects, fraud and misrepresentation. *See In re: CertainTeed Corp. Roofing Shingle Products Liability Litig.*, MDL No. 1817 (E.D. Pa.) (defective organic shingles litigation, firm served as Co-lead Counsel in an MDL that secured a settlement valued at more than $700 million); *In re Building Materials Corp. of Amer. Asphalt Roofing Shingle Prods. Liab. Litig.*, MDL No. 2283 (D.S.C.) (Co-Lead Counsel for a class of approximately six million individuals); *In re: Kitec Plumbing System Products Liability Litig.*, MDL No. 2098 (N.D. Tex.) (Co-Lead Counsel to a $125 million

settlement concerning defective Kitec Plumbing Systems sold throughout the United States); *In re Zurn Pex Plumbing Litig.*, MDL No. 1958 (D. Minn.); *In re Uponor, Inc. F1807 Plumbing Prods. Liab. Litig.*, MDL No. 2247 (D. Minn.) (Lead Counsel); *In re: CertainTeed Fiber Cement Siding Litig.*, MDL No. 2270 (E.D. Pa.); *In re IKO Roofing Shingle Products Liability Litig.*, MDL No. 2104 (C.D. Ill.); *In re: HardiPlank Fiber Cement Siding Litig.*, MDL No. 2359 (D. Minn.); *Gonzalez, et al. v. Owens Corning*, No. 13-cv-1378 (W.D. Pa.) (design defect and misrepresentation action); *Melillo, et. al. v. Building Products of Canada*, Case No. 618-11 (Vermont St. Ct.) (settlement valued at approximately $39-$100 million); *In re: Groupon, Inc. Mktg and Sales Practices* Litig., MDL No. 2238 (D.D.C.). A copy of CGL's firm resume is attached hereto as Exhibit B.

### C. Proposed Liaison Counsel Has Sufficient Resources To Advance The Litigation In A Timely Manner

CGL is capable of committing the resources needed for this litigation during the entirety of its duration. CGL has 21 lawyers and additional, highly capable legal support staff. To be sure, this litigation will be properly staffed with capably experienced attorneys, paralegals, and other legal professionals.

CGL is a well-established firm with the financial wherewithal to support the litigation. Moreover, as stated previously, CGL has served in leadership roles in various complex class action and resource-intensive litigations, and is knowledgeable about the resources necessary to adequately litigate this type of case. CGL and its attorneys are also well versed in the various legal issues pertaining to Rule 23 class certification in this type of case. As demonstrated by CGL's work in the other class actions they have successfully prosecuted, it has the necessary resources to prosecute this action and will devote those resources to the prosecution of this action in a manner that best serves the interests of the class members.

## IV.     CONCLUSION

For the foregoing reasons, the Fraud Group and the Data Breach Group warrant separate Lead Counsel, Liaison Counsel, and Steering Committees to ensure a structure that in a coordinated fashion efficiently protects the diverse interests of the members of each Group and protects against potential conflicts between the Groups.  Michael J. Flannery is well qualified to serve as Liaison Counsel for the Fraud Group.

Dated:  January 22, 2016                    Respectfully submitted,


/s/Michael J. Flannery_____
**CUNEO GILBERT & LADUCA, LLP**
Michael J. Flannery (52714MO)
7733 Forsyth Boulevard
Suite 1675
St. Louis, MO  63105
Tel: (314) 226-1015
mflannery@cuneolaw.com

**CUNEO GILBERT & LADUCA, LLP**
Charles LaDuca
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Tel:  (202) 789-3960
Fax:  (202) 789-1813
charlesl@cuneolaw.com
brendant@cuneolaw.com

**WHITFIELD BRYSON & MASON LLP**
Gary E. Mason
Benjamin Branda
1625 Massachusetts Ave. NW
Ste. 605
Washington, DC 20036
Tel: (202) 429-2290
gmason@wbmllp.com
bbranda@wbmllp.com

**THE BRAUNSTEIN LAW FIRM, PLLC**
Michael L. Braunstein
3 Eberling Drive

New City, NY 10956
Tel: (845) 642-5062
MBraunstein@BraunsteinFirm.com

*Attorneys for Plaintiff Christopher Russell*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P**
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

**ROBBINS ARROYO**
Brian J. Robbins
Kevin A. Seely
Ashley R. Rifkin
Leonid Kandinov
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
arifkin@robbinsarroyo.com
lkandinov@robbinsarroyo.com

*Attorneys for Plaintiff David Poyet*

15

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 22, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, to be served on all participants in the case who are registered CM/ECF users.  I also certify that on January 22, 2016, I served a copy of this document on all attorneys of record by e-mail.

                                                    */s/ Michael J. Flannery*

                                                    Michael J. Flannery